**Dale E. YOUNG II, Appellant,**

v.

**Marion HOBBS, Michael W. Millar, Wilderness Acquisitions, Inc., Baranof Warm Springs Lodge, Inc., Appellees.**

No. S–6416.

Supreme Court of Alaska.

May 10, 1996.

Dennis C. Bailey, Dillon and Findley, P.C., Juneau, for Appellant.

Daniel G. Bruce and Linda T. McKinney, Baxter, Bruce & Brand, Juneau, for Appellees.

Before RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

*OPINION*

RABINOWITZ, Justice.

I.  *INTRODUCTION*

The central issue presented by this appeal is whether the superior court properly ruled that the parties agreed to a settlement contract.

II.  *FACTS AND PROCEEDINGS*

Dale Young and Marion Hobbs were involved in Wilderness Acquisitions, Inc., a corporation which attempted to build a wilderness lodge on Baranof Island in Southeast Alaska.  In the course of the corporation's dissolution, a number of issues were contested, and eventually litigated, including the issue of ownership of high density polyethylene pipe that had been transported to the Baranof Island property.

Before the corporation was dissolved, Young purchased a security interest in the corporation's property, and eventually obtained a foreclosure of this security interest. In the underlying litigation, Young filed a motion requesting determination of the ownership of the pipe which had been removed from Baranof Island by Hobbs.  The superi-

or court ordered Hobbs to return the pipeline to the island, holding "that the pipeline ... was appurtenant to the property purchased by Dale Young at the foreclosure sale[.]" [1] Subsequently, in an effort to have Hobbs comply with the superior court's order requiring return of the pipe, Young filed a motion for order to show cause. The motion was stayed pending a settlement conference scheduled for March 11, 1994.

The settlement conference was not limited to the pipe issue; rather it was intended to resolve all outstanding issues relating to the corporation's dissolution. Accordingly, for several days prior to the settlement conference, Young, Hobbs, and the other corporate members met in an attempt to define and resolve all pending issues. Of significance are three preliminary meetings at which Young and Hobbs discussed the existing pipe dispute: (1) a meeting on March 9; (2) a meeting at Young's house the morning of March 10; and (3) a meeting on the evening of March 10. At issue in this appeal is whether, as a result of these meetings, Young and Hobbs agreed to settle the pipe dispute.

At the global settlement conference held on March 11, all interested parties reached a settlement that was memorialized on the record in Judge Ripley's chambers. Included in the recorded settlement was a reference to the Young–Hobbs pipe dispute:

> Included in this settlement is an agreement between Dale Young and Marion Hobbs for return of the pipe removed from Baranof Warm Springs. That agreement is attached to this settlement and incorporated by reference.

Young and Hobbs, as well as their counsel and other interested parties, were present when the superior court's recitation was made, and no objections were raised. After the recitation, Judge Ripley concluded the settlement conference by stating:

> We recognize that there are going to be documents prepared for dismissal for confession of judgment without action and all the corporate business, but the—this deal

is binding as of now, and if there is any dispute over the language, we all agree it's to be submitted to me informally. We can go on the record, argue it one time, I'll give a ruling as to what we meant if there's a dispute over the language, and it will be binding.

> Any problems with that?

> Okay. I recognize that this has been an incredible amount of give and take. It's now 7:21 in the evening, but in a legal sense we've assumed since everybody's here and everybody has heard this put on record, that it is legally binding, it's voluntarily done by each with the full knowledge of your—the consequences, and I congratulate you for your ability to do this.

> If there's nothing else, we're off record at 7:21.

Though the recorded settlement agreement referred to a side-agreement purporting to settle the pipe dispute between Young and Hobbs, the post-conference drafting process revealed that their dispute was far from resolved. Young contended that their agreement was fully reflected in a written draft that he had prepared and handed to Hobbs when the parties met for the third time on the night of March 10. Hobbs argued that the written draft was deficient. Hobbs additionally argued that both he and Young knew that the written draft was not a complete expression of their agreement. The parties disputed whether Young was to pay Hobbs for the cost of his labor for installing the pipeline on the Baranof Island property, a term absent from Young's written draft.

The superior court's underlying order required Hobbs to return the pipe to Baranof Island "in its same condition"—namely, unassembled. Hobbs argued that Young had agreed during their negotiations that Hobbs would be compensated for his labor cost in installing the pipe. Hobbs brought Young's written draft with him to the settlement conference, discussed with Young what he considered to be its deficiencies, and made handwritten additions to it during the recitation of

---

1. Hobbs filed a petition for review of Judge Carpeneti's decision, which was denied on October 12, 1993.

the global settlement agreement. Immediately after the settlement conference ended, the parties presented their dispute to Judge Ripley, who decided to hold a hearing regarding the particulars of Young and Hobbs's pre-conference negotiations. At the hearing, Young and Hobbs, as well as others who were privy to the negotiations, testified. Neither Young nor Hobbs explicitly disputed the existence of an agreement. Rather, each asserted that his respective version of the draft represented the agreement.

At the conclusion of the hearing, the superior court entered the following findings of fact:

2. ... Marion Hobbs presented evidence that a material term of the settlement agreement was that he was to be paid by Dale Young for the labor costs for Marion Hobbs and his company to obtain certain permits and to install a water pipeline on Dale Young's property in Baranof Warm Springs.... Marion Hobbs' version of the agreement is set forth in Plaintiff's Exhibit 1.

3. Dale Young denied that the settlement contained any requirement that he pay Marion Hobbs for his labor. Dale Young presented testimony that Defendant's Exhibit A contained all the material terms of their agreement. Dale Young testified that the payment of Marion Hobbs for his labor costs was never discussed as part of this settlement agreement.

4. Since the dispute centers over the parties' respective versions of the agreement, credibility is a major issue. After consideration of the testimony, the court resolves questions of credibility in favor of Marion Hobbs. The preponderance of the evidence favors Hobbs' version of the settlement agreement. All of the witnesses, except Dale Young, recall that the settlement offer conveyed by Marion Hobbs to Dale Young contained a provision for the payment of Marion Hobbs' labor to install the pipeline on Dale Young's property. A number of the witnesses were present when discussions occurred, either between the parties or in the parties' presence, over the disputed term.

5. The court finds that Dale Young must have known that a material term of the settlement agreement for Marion Hobbs was the payment of his labor costs to obtain the permits and install the pipeline. The court finds that Dale Young agreed to this term and the use of the Industrial Plastics Pipeline Replacement bid as the basis for calculating the labor costs to be paid to Marion Hobbs for his work.

6. Furthermore, the preponderance of the evidence establishes that the agreement as construed by Dale Young in Defendant's Exhibit A is so unfair and one-sided that it is unreasonable to conclude that Marion Hobbs would have agreed to settle on those terms. The overall consistency of the evidence presented to this court establishes the credibility of Marion Hobbs' version of the settlement agreement.

Based upon these findings the superior court concluded:

1. Marion Hobbs and Dale Young had reached a meeting of the minds on or before the settlement conference of March 11, 1994 regarding the resolution of the pipeline dispute.

2. The agreement reached by Marion Hobbs and Dale Young was sufficiently definite and certain as to be an enforceable agreement.

3. The Pipeline Settlement Agreement as set forth in Plaintiff's Exhibit No. 1 shall be incorporated by reference in the settlement agreement entered in open court on March 11, 1994 and the terms of both agreements shall be binding on all parties to Case No. 1JU–92–674 CIV and shall be entered as a final judgment of the court.

This appeal followed.

### III. STANDARD OF REVIEW

Whether the superior court erred in finding that Young and Hobbs reached a meeting of the minds is a question of fact. As stated in *Juliano v. Angelini:*

Whether the parties to an informal agreement become bound prior to the drafting

and execution of contemplated formal writings is a question of intent. The intent of the parties is to be determined by the surrounding facts and circumstances of each case, and is reviewed under the clearly erroneous standard of Civil Rule 52(a).

708 P.2d 1289, 1291 (Alaska 1985) (citations omitted). Thus, the superior court's conclusion that Young and Hobbs "had reached a meeting of the minds on or before the settlement conference of March 11, 1994" will be reversed only if its finding is clearly erroneous. *Id.*

## IV. *DISCUSSION*

█ The superior court ruled that Young and Hobbs had reached a meeting of the minds regarding the pipe issue on or before the day of the global settlement conference. We turn to the question of whether the superior court's findings of fact are clearly erroneous.

█ "The formation of an express contract requires an offer encompassing its essential terms, an unequivocal acceptance of the terms by the offeree, consideration and an intent to be bound." *Childs v. Kalgin Island Lodge,* 779 P.2d 310, 314 (Alaska 1989); *Hall v. Add–Ventures, Ltd.,* 695 P.2d 1081, 1087 n. 9 (Alaska 1985) (citing 1 W. Jaeger, *Williston on Contracts* § 64 at 211, § 72 at 235, § 73 at 128 (3d ed.1957)). "Mutual assent is an elementary requirement for a binding contract." *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1281 (Alaska 1985) (citing *State v. Fairbanks North Star Borough School District,* 621 P.2d 1329, 1331 n. 3 (Alaska 1981)).

In reviewing questions of intent, we have stated:

> In determining the parties' intent, the courts look first to the parties' expressed intentions. "If their expressions convince the court that they intended to be bound without a formal document, their contract is consummated, and the expected formal document will be nothing more than a memorial of that contract."

*Juliano,* 708 P.2d at 1291 (quoting 1 A. Corbin, *Corbin on Contracts* § 30 at 98–99 (1963)).[2]

Our review of the entire record in this case leads us to the conclusion that Young and Hobbs never reached a meeting of the minds regarding settlement of their dispute over the pipe. Our conclusion is based in part on the following evidence.

Young's draft "Proposal for Pipeline Issue Resolution" represents his version of the agreement with Hobbs regarding the pipe issue. Hobbs, however, asserts that Young agreed to four additional or differing terms relating to default, time for performance, Hobbs's pipe installation labor costs, and performance bond or security.[3] The discrepancies between the two versions are clearly substantial.

Even more telling are certain portions of Hobbs's testimony. Hobbs testified that when Young presented him with the draft "Proposal for Pipeline Issue Resolution" and asked him to review it, Hobbs told Young that he could not say "Yes, I agree." Hobbs stated he could not agree because "I knew more had to be added, because this is all his

---

**2.** Similarly, the Restatement (Second) of Contracts provides, in pertinent part:

> Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.

Restatement (Second) Contracts § 27 (1981).

**3.** Hobbs's handwritten edits to the typed agreement were as follows:

> 9. In the event of a default *by Marion* in this agreement, ~~Marion will pay Dale the amount of money that was claimed for replacement costs and submitted to the court~~. will replace all the original 12 & 10″ pipe on the property.
> 10. A time certain agreeable to both parties will be set for performance. 2 years

(Underlined text added by Hobbs.) Hobbs also added the following two paragraphs to the agreement:

> 13. Dales [sic] agreed to pay Marion Hobbs the the [sic] lump sum that he submitted to the court of his cost to replace the pipe of $~~149,233.23~~ 112,057.08 less the cost of materials & freight.... A copy of the cost of materials will be given to Dale.
> 14. Dales [sic] agrees to put the money into escrow until the project is completed. Then dispurse [sic] to Marion Hobbs upon an engineer's approval.

half, on his thoughts, and it did not include my thoughts at all." When asked at the global settlement conference held in Judge Ripley's chambers whether he had any discussion with Dale Young regarding the "Proposal for Pipeline Issue Resolution", Hobbs replied in the affirmative. He stated, "I sat out here and said, 'Dale, I can't accept this. I've—my thoughts are not into this yet.' ... and I told him that I have to finalize—we have to finalize it. We have to come up with the numbers."

Concerning his handwritten modifications of Young's "Proposal for Pipeline Issue Resolution," Hobbs testified that the purpose of his additions was "to put my half of the thoughts on how this ... pipeline issue was to be solved.... It was the continuation ... of us trying to solve it." When asked about the additional term regarding payment for labor installation costs, Hobbs responded in part that "I do not have an exact figure, but I'm going to say you're talking probably—to do the work, to install the pipe and et cetera is probably about $70,000." [4] Regarding all of his handwritten additions to the draft, Hobbs testified that he made them because "[t]his has got to be put—this has got to be part of the agreement."

Greg Young, Dale Young's brother, testified concerning what transpired between Dale and Hobbs at their first and third preliminary settlement meetings. Greg Young testified that his brother Dale and Hobbs had been working toward an agreement and that it was his understanding that "they had what I'd consider a draft agreement." Greg Young further testified that Hobbs had a copy of Dale's draft and "had written in ink at the bottom what he had discussed or what he felt were conditions under which he would do his part of it. But I don't know if he had given that to Dale." Furthermore, Greg Young testified as follows:

Q. At the settlement conference, was it your understanding that Dale. and Marion had reached an agreement so that it was no longer an issue on the table?

A. No. It was my understanding that they were going to finalize the agreement after the settlement hearing.

Based on the evidence outlined above and our review of the entire record, we hold that the superior court's conclusion that "Marion Hobbs and Dale Young had reached a meeting of the minds on or before the settlement conference of March 11, 1994, regarding the resolution of the pipeline dispute" must be set aside since it is clearly erroneous. Although the evidence does indicate that Dale Young and Marion Hobbs reached preliminary agreements on several issues relating to their pipe dispute, review of the entire record demonstrates that the parties failed to agree on the final material terms of a settlement of their pipe dispute.

## V. CONCLUSION

The settlement of the pipe dispute was an integral and major part of the global settlement. Since the parties never reached agreement on this material issue, they could not have reached a meeting of the minds regarding the global settlement. Therefore, we VACATE the settlement and REMAND for further proceedings.

MOORE, C.J., not participating.

---

4. Hobbs additionally testified that "there was no $70,000—number ever came up ... because the agreement is that we're using Dale's numbers that he turned in to the court...."