NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| MARK HELMERICKS, ) | |
| ) | Supreme Court Nos. S-17425/17435 |
| Appellant, ) | (Consolidated) |
| ) | |
| v. ) | Superior Court Nos. 4FA-08-00003 PR/ |
| ) | 4FA-18-01454 CI (Consolidated) |
| PEAK TRUST COMPANY, JANET ) | |
| TEMPEL, JEFFREY HELMERICKS, ) | MEMORANDUM OPINION |
| JAMES HELMERICKS, ANN ) | AND JUDGMENT* |
| HELMERICKS, and JEAN ASPEN, ) | |
| ) | No. 1793 – September 30, 2020 |
| Appellees. ) | |
| ) | |
| ) | |
| HOLLIS HELMERICKS and RYAN ) | |
| HELMERICKS, ) | |
| ) | |
| Appellants, ) | |
| ) | |
| v. ) | |
| ) | |
| PEAK TRUST COMPANY, JANET ) | |
| TEMPEL, JEFFREY HELMERICKS, ) | |
| JAMES HELMERICKS, ANN ) | |
| HELMERICKS, and JEAN ASPEN, ) | |
| ) | |
| Appellees. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Jane F. Kauvar, Judge.

---

\*      Entered under Alaska Appellate Rule 214.

Appearances: Howard S. Trickey and Christopher J. Slottee, Holland & Knight LLP, Anchorage, for Appellant Mark Helmericks. Peter A. Sandberg, Ingaldson Fitzgerald, P.C., Anchorage, for Appellants Hollis and Ryan Helmericks. Jennifer M. Coughlin, Landye Bennett Blumstein LLP, Anchorage, for Appellees Peak Trust Company and Janet Tempel. Timothy Seaver, Seaver & Wagner, LLC, Anchorage, for Appellees Jeffery and James Helmericks. No appearance by Appellees Ann Helmericks and Jean Aspen.

Before: Bolger, Chief Justice, Winfree, and Carney, Justices. [Maassen, Justice, not participating.]

## I.    INTRODUCTION

After one beneficiary challenged the modification of a family trust, leading to over a decade of litigation, the trust beneficiaries reached and recorded an oral settlement following court-ordered mediation. The primary beneficiaries agreed that they and their descendants and heirs would be bound by the terms of the agreement. All beneficiaries agreed any disputes that arose in the future would be submitted to the mediator for a final, binding decision.

Approximately a year later the same beneficiary filed a notice with the court asserting that the parties had been unable to reach an agreement on settlement terms. The superior court found that the settlement was enforceable and ordered the parties to return to the mediator for a decision on disputed terms.

The beneficiary and his two children appeal the superior court's order,[1] arguing that the settlement is unenforceable. They also appeal the court's denial of their motion for an evidentiary hearing as well as one of its evidentiary rulings. Because the superior court did not err, we affirm.

---

[1]    We consolidated their separate appeals.

## II. FACTS AND PROCEEDINGS

### A. Trust Background

Martha and Bud Helmericks were longtime residents of Alaska.[2]  In 2001 they created an irrevocable trust to control their property, which consisted of large tracts of remote land in northern Alaska.  The trust assets were four limited liability companies (LLCs) created to own and manage the land.  Walker Lake LLC owned land on Swan Island in Walker Lake; Corwin LLC owned coal mine property; Sheep Spirit LLC owned land on Takahula Lake; and Newkset LLC owned land on the Colville River.

Although they had five children — Bud had two daughters, Jean and Annie; Martha had a son, Jim; and they had two sons together, Mark and Jeff — the trust initially named only Mark, Jeff, and Jim, and their spouses and descendants, as beneficiaries.[3]  Mark and Jeff were named co-trustees.

In 2007 Martha and Bud petitioned the court to modify the trust.  They based their request on their reconciliation with Jean and Annie and a breakdown in communication between Mark and Jeff:  "[B]ecause of their personal differences [Mark and Jeff were] not performing their fiduciary duties . . . and [were] painfully disagreeable even with respect to rather routine matters."  They asked the court to add Jim, Jean, and Annie as co-trustees to break the management gridlock and to add Jean and Annie and their descendants as trust beneficiaries.  After a hearing the court granted the petition.  Mark appealed.

By 2010 Mark had two appeals pending.  Following mediation with Senior Superior Court Judge Elaine Andrews, both cases settled.  The parties agreed that an

---

[2]     Bud died in January 2010.

[3]     For clarity we refer to family members by the first names used in the family.

independent trustee would serve as sole trustee; in 2012 Alaska USA Trust Company was appointed.

In 2014 Alaska Trust Company acquired Alaska USA Trust Company.[4] Soon thereafter, the trustee petitioned the court to terminate the trust and distribute its assets among the beneficiaries. Mark opposed the petition.

## B.     Second Mediated Settlement

In 2016 Mark moved for an order requiring the parties to return to mediation with Judge Andrews. The court granted Mark's motion and ordered that "[t]he primary beneficiaries shall represent the interests of their respective families." None of the parties objected to this order.

Judge Andrews held a two-day mediation. The parties reached a settlement to resolve all of their remaining disagreements. Under the agreement, Jim would "receive ownership of Newkset LLC, except for the Thetis Island property, contingent upon securing a landfill closure agreement." Mark would "purchase the Corwin LLC and the Thetis Island property" and "receive a 20-year lease to the original Colville homestead." The Walker Lake LLC would have six members: Jean, Annie, Jeff, and Jim, each with a 20% interest, and Ryan and Hollis (Mark's two children), each with a 10% interest. Ryan and Hollis also would "have a right of first refusal to purchase Walker Lake."

Judge Andrews made an audio recording to document the agreement. The recording was made in two parts — first memorializing Mark's agreement, then that of the remaining beneficiaries. At the beginning of the recording Judge Andrews stated: "[W]e've reached a settlement. I'm going to state what I believe the terms of the

---

[4]     Peak Trust Company later acquired Alaska Trust Company; Peak is thus one of the parties in this appeal.

settlement are and we can be corrected or supplemented as we go along here." As she proceeded through the various terms of the agreement, Judge Andrews stated that she would "reserve jurisdiction on every dispute in connection with this settlement." In response, Mark's attorney reiterated that "if there's disputes over what the term is or should be, [Judge Andrews] gets to decide what the term is."

Judge Andrews questioned Mark directly to verify that he was "not under the influence of any drugs or alcohol or medication or anything that would cloud [his] thinking and prevent [him] from making a knowing, voluntary and final decision." Mark confirmed that he was not. She clarified that he "underst[ood] that entering into the settlement means it's final and that neither [he] nor the other beneficiaries will be able to . . . change [his] mind." Mark's response was "I understand and I agree." He also acknowledged that he had been in contact with his children during the mediation and affirmed that his agreement bound him and his children.

Mark's attorney represented him during the next part of the recording, when Judge Andrews confirmed with the other beneficiaries their agreement that a final and binding settlement had been reached. Judge Andrews again stated that she would "reserve jurisdiction to resolve all disputes regarding the operating agreement [and] any of the documents necessary or agreements necessary to effect the settlement." And she reiterated that her decision would be "final and binding on all parties. So there can be no further litigation over this."

Judge Andrews reviewed the terms of the settlement and confirmed with each of the remaining parties that they were knowingly and voluntarily agreeing to settle the litigation and that they understood that they and their descendants and heirs would be bound by the settlement. Mark's attorney stated that he planned to draft the operating agreement and then "hammer through the details" with Peak's attorney who would represent the interests of all trust beneficiaries. Judge Andrews reminded the parties,

"[I]f you can't reach an agreement on the operating agreement, you tell me what your disputes are and I'll tell you what the answer is and you'll have to live with my answer."

## C. Subsequent Events

In the year following the settlement, Jim completed the process of closing the landfill on the Newkset property. Early the next year, in February 2018, Mark filed a notice with the superior court, alleging that the parties "ha[d] been unable to reach agreement on the material terms of a settlement in the mediation." Ten days later, his children Ryan and Hollis filed a complaint against Peak alleging it had mishandled the trust. The superior court consolidated their suit with Mark's.

About two months later Peak's attorney wrote to Judge Andrews requesting that she arbitrate the dispute as agreed in the mediation settlement. Mark responded with a letter to Judge Andrews demanding that she "not attempt to arbitrate based upon the 'reserve jurisdiction' language from the transcript."

After receiving Mark's notice, the superior court reviewed the settlement transcript. On February 11, 2019, it issued an order "direct[ing] the parties to appear . . . and show cause why [they] should not be directed to Judge Andrews for her to resolve all disputes arising out of the settlement and disposing of the assets as agreed." All parties filed written responses and the court scheduled oral argument. After the argument, the court took the matter under advisement to "review everything in light of everybody's argument[s]." The court also noted Mark's objection to its consideration of emails from Judge Andrews that had been attached to Jeff and Jim's written response; it declined to allow Mark to file any additional documents.

## D. Superior Court's Order

The court issued a written order two months later returning the case to Judge Andrews. It first found that "all of the essential terms of the agreement" had been recorded, even though there were some remaining terms that had not been explicitly

decided at the settlement. The court next found "clear acceptance of the agreement" by all parties. Citing *Ford v. Ford*[5] and *Lee v. Sheldon*,[6] the court found that "the contents of the recording and transcript constitute a binding and final agreement and that the parties accepted the agreement and intended to be bound by it."[7]

The superior court flatly rejected Mark's arguments that the parties rescinded their agreement and that he was entitled to rely on the other parties' lack of response to his notice that a settlement had not been reached. In a final footnote the court stated:

> Mark's efforts to throw out the settlement do not show that there was no settlement. Mark also argues that the other parties should be estopped from enforcing the agreement due to their inaction after his February 2018 notice. However, the Court does not find that Mark could reasonably rely on their non-responsiveness to his notice as "an assertion [by the other beneficiaries] that there was no binding settlement," particularly considering that Jim made efforts to close the landfill in 2017, before Mark's 2018 notice, in accordance with the settlement agreement. Further, Mark filed suit against the Trust, so the parties were responding to that. Mark is the only sibling that now wants to reject the settlement. His efforts to undo the settlement do not establish that a binding settlement was not reached. (Alteration in original.)

---

[5]   68 P.3d 1258 (Alaska 2003).

[6]   427 P.3d 745 (Alaska 2018).

[7]   The court found, in the alternative, that Jim's actions in "undertaking the cleanup and closure of a landfill" support his claim of equitable estoppel and thus "even if no valid settlement existed under the aforementioned traditional contract principles, Mark would still be estopped from denying the existence of an agreement."

Mark appeals, joined by Ryan and Hollis who make substantially the same arguments as Mark.

## III.  STANDARD OF REVIEW

"We interpret settlement agreements as contracts."[8] "We review 'questions of contract formation and interpretation de novo' in the absence of factual disputes."[9] A court's decision regarding whether the parties "reached a meeting of the minds is a question of fact" and "will be reversed only if the superior court's findings of fact are clearly erroneous."[10] "We review the factual findings underlying the superior court's decision for clear error."[11] "We review a grant of summary judgment de novo."[12] And "[w]e review a trial court's decision to admit evidence for an abuse of discretion."[13]

## IV.  DISCUSSION

### A.  The Superior Court Did Not Err By Finding That The Settlement Agreement Was Enforceable And Enforcing The Agreement's "Reserve Jurisdiction" Term.

We have recognized Alaska's "strong public policy in favor of the settlement of disputes."[14] By "facilitat[ing] communication and compromise,"[15]

---

[8]  *Calais Co. v. Ivy*, 303 P.3d 410 (Alaska 2013) (citing *Chilkoot Lumber Co. v. Rainbow Glacier Seafoods, Inc.*, 252 P.3d 1011, 1014 (Alaska 2011)).

[9]  *Bingman v. City of Dillingham*, 376 P.3d 1245 (2016) (quoting *Chilkoot Lumber Co.*, 252 P.3d at 1014)).

[10]  *Young v. Hobbes*, 916 P.2d 485 (Alaska 1996).

[11]  *Id.*

[12]  *Mitchell v. Teck Cominco Alaska Inc.*, 193 P.3d 751, 757 (Alaska 2008).

[13]  *Kava v. Am. Honda Motor Co.*, 48 P.3d 1170, 1173 (Alaska 2002).

[14]  *Mullins v. Oates*, 179 P.3d 930, 937 (Alaska 2008) (quoting *Municipality*

(continued...)

settlements "simplify, shorten and settle litigation without taking up valuable court resources."[16] We have also recognized that "settlement agreements are, at base, merely a species of contract and are therefore binding only if they 'meet minimal contractual requirements.' "[17]

In order to bind the parties, a settlement agreement must "satisf[y] the four elements of contract formation."[18] Those elements are: (1) "an offer encompassing all essential terms," (2) "unequivocal acceptance by the offeree," (3) "consideration," and (4) "an intent to be bound."[19]

Mark and his children argue that the settlement agreement does not meet those requirements. They argue that the agreement was only a "settlement framework" that did not contain the "essential terms" needed to create a binding contract. They assert that because the agreement could not be binding without all the essential terms, the mediator could not "reserve jurisdiction" to decide disputes about such terms.

Mark and his children also argue that the parties never finalized an agreement; Ryan and Hollis point out that they were not present during the mediation. In addition, Mark argues that the other parties' "fail[ure] to take any action" in response to his notice to the court indicates either that the parties did not reach a settlement

---

[14] (...continued)
*of Anchorage v. Schneider*, 685 P.2d 94, 98 (Alaska 1984)).

[15] *Id.*

[16] *Id.* (quoting *Interior Credit Bureau, Inc. v. Bussing*, 559 P.2d 104, 106 (Alaska 1977)).

[17] *Id.* (quoting *Rice v. Denley*, 944 P.2d 497, 499 n.4 (Alaska 1997)).

[18] *Chambers v. Scofield*, 247 P.3d 982, 987 (Alaska 2011).

[19] *Id.*

agreement or that the other parties accepted his notice as an offer to revoke the agreement.

None of these arguments have merit.[20]

### 1. Because the settlement agreement encompassed all essential terms, the "reserve jurisdiction" term is enforceable.

It is a basic principle of contract law that, to be enforceable, a contract "must be reasonably definite and certain as to its terms."[21] A final agreement "must extend to all the terms which the parties intend to introduce and material terms cannot be left for future settlement."[22] But as long as a "gap in the agreement can be filled in a manner reasonably certain to correspond to the reasonable expectations of the parties," the contract remains enforceable.[23]

Nothing prohibits parties from including a term in a mediated settlement that allows future disputes to return to the mediator for a final, enforceable ruling.[24] And even if an oral settlement agreement contemplates that the agreement will be reduced to writing, the parties are free to agree that the oral settlement is final and binding.[25] Such

---

[20]   We therefore do not reach arguments regarding the superior court's alternative holding that a contract was formed through equitable estoppel.

[21]   *Alaska Creamery Prod., Inc. v. Wells*, 373 P.2d 505, 510 (Alaska 1962).

[22]   *Id.*

[23]   *Kodiak Island Borough v. Large*, 622 P.2d 440, 447 (Alaska 1981).

[24]   *See, e.g.*, *Lee v. Sheldon*, 427 P.3d 745 (Alaska 2018); *Young v. Hobbs*, 916 P.2d 485 (Alaska 1996).

[25]   *See Thrift Shop, Inc. v. Alaska Mut. Sav. Bank*, 398 P.2d 657, 658-59 (Alaska 1965) ("It is true that words and acts of the parties may constitute sufficient manifestations of assent to make a binding oral contract, even though the parties also had contemplated that their agreement would later be reduced to writing.").

an oral agreement remains final and binding even if the parties do not later draft a written document.[26]

The superior court noted that the transcript of the "settlement agreement is 29 pages long and encompasses countless terms, points of agreement, questions, and clarifications." It summarized the main terms of the agreement and, based on those terms, found that "there [was] consideration and . . . a meeting of the minds regarding the terms of the settlement." Although the court acknowledged that the parties still needed to "hammer through the details" following their mediation, the court found that "all of the essential terms of the agreement are recorded" and there remained only "the details which must be decided to bring the settlement terms into effect."

Mark's brief includes a laundry list of missing terms he characterizes as "material," including terms addressing specific property rights, terms in the Walker Lake LLC operating agreement, and terms setting out a timeline to put the settlement into effect. In response, Jeff and Jim contend that Mark's "list is either directly contrary to the transcript of the agreement or includes items that are manifestly *not* material." (Emphasis in original.) They also argue that some of the allegedly "missing" terms, such as those addressing property rights and many of the terms of the LLC operating agreement, were actually provided for in the settlement agreement. They characterize the remaining items in the list as "quibbles" which are "all addressed by the beneficiaries' agreement that Judge Andrews retained jurisdiction to 'resolve all disputes regarding the operating agreement, any of the documents necessary or agreements necessary to affect the settlement.' "

---

[26] *See Ford v. Ford*, 68 P.3d 1258, 1265 (Alaska 2003) (noting that "references to a later writing do not support [participant's] position that the recital was not final and binding").

Jeff and Jim's argument is well taken. Even if the settlement did not set out the minutiae of the operating agreement, it nonetheless included all of the *essential* terms. In cases that did not involve an agreement to return to mediation to resolve later disputes, we have recognized that, "courts may 'fill gaps in contracts to ensure fairness where the reasonable expectations of the parties are clear.' "[27] Here Mark requested and the court ordered that the parties return to mediation with Judge Andrews in the hope that she would again be able to mediate a settlement of their ongoing disputes. At the conclusion of their successful mediation, the parties explicitly acknowledged that the oral settlement would be supplemented with additional, consistent terms when it was reduced to writing. Each of them agreed that the mediator "reserve[d] jurisdiction" to decide any disputes that arose during that process. Their agreement to allow Judge Andrews to decide those disputes clearly authorized her to "fill gaps" in the contract.[28]

The superior court did not err when it found that the oral agreement was an enforceable settlement. Even though the parties expected that their agreement would be reduced to writing but later were unable to do so, they discussed and agreed to all of the essential terms, and at the conclusion of their mediation, they recorded their agreement and their acknowledgment that they were knowingly and voluntarily agreeing to be

[27]     *Magill v. Nelbro Packing Co.*, 43 P.3d 140, 142 (Alaska 2001) (quoting *Rego v. Decker*, 482 P.2d 834, 837 (Alaska 1971)); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 204 cmt. d (AM. LAW INST. 1981) ("But where there is in fact no agreement, the court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process.").

[28]     *See* RESTATEMENT (SECOND) OF CONTRACTS § 216 cmt. b (AM. LAW INST. 1981); *see also id.* at § 216 cmt. d (stating that even when a contract term's "omission does not seem natural, evidence of the consistent additional terms is admissible unless the court finds that the writing was intended as a complete and exclusive statement of the terms of the agreement").

bound by the oral settlement. It is apparent that the parties intended the agreement to be final, recognized that some non-essential terms were to be settled by their attorneys "hammer[ing] through the details," and granted Judge Andrews the final decision over any disputes that might arise from that process. When the beneficiaries were unable to agree on those non-essential terms, the superior court did not abuse its discretion by enforcing the term that "reserve[d] jurisdiction" to Judge Andrews and ordering the parties return to mediation.

### 2. The parties demonstrated unequivocal acceptance and intent to be bound to the agreement.

"An essential requirement of an enforceable settlement agreement is the parties' mutual assent to the agreement's terms."[29] For a settlement to be enforceable against a party, the party must have entered into the agreement "voluntarily and knowingly."[30] Evidence of "a party's active negotiation of settlement terms, affirmative participation in clarifying terms on the record, and failure to object despite the opportunity to do so" indicates the party's voluntary and knowing acceptance.[31]

Mark and his attorney actively participated in the settlement, often speaking on the record to clarify terms of the agreement, including the disputed "reserve

---

[29] *Colton v. Colton*, 244 P.3d 1121, 1127-28 (Alaska 2010).

[30] *Mullins v. Oates*, 179 P.3d 930, 937 (Alaska 2008); *see also Colton*, 244 P.3d at 1129 ("Where a settlement agreement relating to the division of property meets basic contractual requirements, it should be enforced, absent 'fraud, duress, concealment of assets or other facts showing the agreement was not made voluntarily and with full understanding.' " (quoting *Murphy v. Murphy*, 812 P.2d 960, 965 (Alaska 1991))).

[31] *Colton*, 244 P.3d at 1129; *see also Mullins*, 179 P.3d at 937 (noting that when a party "agreed to the terms of the settlement that were placed on the record after actively negotiating those terms," the record was evidence that the party intended to be bound).

jurisdiction" term. Before confirming with Mark that he agreed with the settlement, Judge Andrews questioned him about whether he was "under the influence of . . . anything that would . . . prevent [him] from making a knowing, voluntary, and final decision." Mark said he was not. She confirmed with him that he understood the settlement was final and that neither he nor the other beneficiaries would be able to change their minds. Mark responded: "I understand and I agree."

Mark's explicit affirmation that he was knowingly and voluntarily entering into a final settlement agreement easily establishes that he accepted its terms.[32] The record supports the superior court's finding that Mark voluntarily and knowingly accepted the oral agreement. The court did not clearly err when it found that the record demonstrated Mark's "clear acceptance of the agreement."

### 3. The other parties' "inaction" after Mark filed his notice does not indicate that they rescinded their binding settlement agreement or agreed with Mark that they had not reached an agreement.

Mark makes the same argument on appeal that the superior court rejected: that the other parties' lack of response to his notice that settlement negotiations had failed constituted an "agreement" that there was no settlement or, alternatively, that it constituted acceptance of his "offer" to rescind the settlement. We agree with the

---

[32] Mark's agreement, like the other beneficiaries', that his "heirs and assigns" were bound by the oral settlement disposes of Ryan and Hollis's argument that they did not agree. In addition, Mark advised Judge Andrews and the other parties that he was in contact with his children during the settlement negotiations. Because Ryan and Hollis received notice of the court-ordered mediation, were in communication with Mark throughout it, and did not object to being bound by it despite their absence until this appeal, their argument both lacks merit and is waived.

superior court: "Mark's efforts to throw out the settlement do not show that there was no settlement."[33]

Nor does the record support his claim that the other parties failed to respond to his notice. Mark's acrimonious relationship with the other beneficiaries is undisputed, as is their lack of Mark's willingness to litigate. That they did not respond in kind to Mark's notice[34] is a far cry from his implicit argument that they did nothing. Three months before Mark filed his notice, Jim completed the process of closing the Newkset landfill as required by the settlement agreement. Mark was still engaged in active litigation with Peak regarding its management of the trust. Peak wrote to Judge Andrews about two months after Mark's notice, requesting that she resolve the dispute; Mark responded to Peak's letter with one of his own, demanding that Judge Andrews deny Peak's request. And in a hearing in Mark, Ryan, and Hollis's consolidated case against Peak, Jeff and Jim's attorney advised the court that their position was that the trust dispute "absolutely was settled."

The record before the superior court demonstrates that there was no "inaction" in response to Mark's notice, nor did the other parties' actions indicate their acceptance of his notice as rescinding any settlement.[35] The superior court did not

---

[33] *Cf. Ford v. Ford*, 68 P.3d 1258, 1266 (Alaska 2003) (noting that to credit a party's "argument that his failure to abide by the agreement is evidence that he did not believe he was bound by it opens the door for any party to a contract to breach the contract and then use that breach as evidence of his or her belief that no contract had been entered").

[34] *See* Alaska R. Civ. P. 7(a) (listing pleadings allowed; not including "notice"); Alaska R. Civ. P. 77 (listing motions allowed; not including "notice").

[35] *See* RESTATEMENT (FIRST) OF CONTRACTS § 72 cmt. a (AM. LAW INST. 1932) ("Ambiguous silence, like ambiguous words, must have its effect determined by
(continued...)

clearly err by finding that Mark could not reasonably rely on "inaction" to indicate that the settlement agreement never existed or was revoked.

**B.** **The Superior Court Did Not Abuse Its Discretion By Denying Mark's Request For An Evidentiary Hearing.**

Mark and his children argue that the court abused its discretion when it denied his request for an evidentiary hearing because there were issues of fact that needed to be resolved. They argue that there were questions about the parties' conduct during and after mediation. There is no merit to their arguments.

"Summary judgment is proper if there is no genuine factual dispute and the moving party is entitled to judgment as a matter of law."[36] This case is particularly well-suited for summary judgment. Everything that occurred during the process of reducing the result of mediation to a settlement is fully contained in the transcript of the settlement agreement. The superior court relied solely on the settlement transcript and Alaska law regarding settlements in making its decision. As Judge Andrews stated in the recording, the purpose of recording the settlement agreement and having all parties attest that they were making a "knowing, voluntary, sober, binding decision" was to avoid the need for an evidentiary hearing regarding the parties' intent at the time of settlement.[37] As a result, there was no need for the superior court to hear evidence about any missing terms; it was able to review the undisputed recording of the settlement agreement to determine

---

[35]    (...continued)
actual mental attitude and for the same reason.").

[36]    *Mitchell v. Teck Cominco Alaska Inc.*, 193 P.3d 751, 757 (Alaska 2008).

[37]    *See Ford*, 68 P.3d at 1266 ("Simple affirmations by the parties of their understanding and intent to be bound may have obviated the need for an extensive evidentiary hearing and for later detailed reviews of the recitations made at the recorded session.").

which terms were provided for in the agreement and which were not. It then applied the law to those undisputed facts.

Mark also claims there was an issue of material fact regarding the parties' actions after the settlement agreement. But there was no need for additional evidence on that topic. His notice was filed with the superior court and its existence undisputed. It is not contested that the siblings did not file any direct response to his notice. Because none of the evidence in Mark's response to the court's order to show cause nor the evidence relied upon by the court was genuinely disputed, the court did not err by denying Mark's motion for an evidentiary hearing.

### C. The Superior Court Did Not Abuse Its Discretion By Failing To Rule On The Admissibility Of Emails From Judge Andrews.

At the end of oral argument, Mark's attorney objected to two emails from Judge Andrews that were attached to Jeff and Jim's written response to the court's order to show cause and requested to submit additional emails between the parties and Judge Andrews for the court's consideration.[38] The court responded that he "may object to them" but that he "may not add anything." Although the superior court did not rule on the emails' admissibility, it also did not rely on the documents in its order. Even assuming the emails were erroneously admitted,[39] the court's failure to directly rule on

---

[38] *See* Alaska R. Evid. 408 (making inadmissible "[e]vidence of conduct or statements made in compromise negotiations"); Alaska R. Civ. P. 100(g) ("Evidence of conduct or statements made in the course of court-ordered mediation is inadmissible to the same extent that conduct and statements are inadmissible under Alaska Rule of Evidence 408.").

[39] *But see* Alaska R. Evid. 408 (noting that the rule "does not require exclusion when the evidence is offered for another purpose").

their admissibility when it did not rely on them in its decision does not constitute reversible error.[40]

## V. CONCLUSION

The superior court's decision is AFFIRMED.

---

[40] *See Amy S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 440 P.3d 273, 279 (Alaska 2019) ("Even if we conclude that an error has been committed, '[w]e must disregard harmless errors that have no substantial effect on the rights of parties or on the outcome of the case.' " (alteration in original) (quoting *Luther v. Lander*, 373 P.3d 495, 499 (Alaska 2016))).