NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JEREMY NOVAK,<br><br>    Appellant,<br><br>v.<br><br>LAURA NOVAK,<br><br>    Appellee. | Supreme Court No. S-15524<br><br>Superior Court No. 3AN-12-11698 CI<br><br>MEMORANDUM  OPINION<br>  AND JUDGMENT*<br><br>No. 1551 – August 26, 2015 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Patrick J. McKay, Judge.

Appearances: Darryl L. Thompson, Darryl L. Thompson, P.C., Anchorage, for Appellant. Maurice N. Ellis, Law Office of Maurice N. Ellis, Anchorage, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

I.     INTRODUCTION

Laura and Jeremy Novak divorced in 2014. They have one son; Laura was awarded primary physical custody. Both are employed, but Jeremy earns a substantially larger income. Laura was awarded the family home and temporary spousal support. Jeremy was ordered to pay child support pursuant to Alaska Civil Rule 90.3, child care expenses, and $10,000 of Laura's attorney's fees. Jeremy appeals the property division, spousal support, child care, and attorney's fees decisions. We conclude that it was

---

\*     Entered under Alaska Appellate Rule 214.

improper to require Jeremy to pay certain child care expenses in addition to child support and that a post-separation loan was incorrectly classified as a marital debt. We also conclude that the superior court must clarify the balance of the mortgage on the marital home. We affirm the judgment in all other respects.

## II.    FACTS AND PROCEEDINGS

Laura Novak and Jeremy Novak were married in November 2006 and separated in August 2011. They have one son. Laura was 45 at the time of trial and Jeremy was 37. Laura filed for divorce in December 2012. Both parties were represented by counsel. Laura requested primary physical custody of their son, $2,000 monthly in reorientation spousal support for two years, and $5,000 in attorney's fees. Laura requested a 70-30 division of the other property in her favor, which she asserted was fair and equitable due to the large income disparity and because she is eight years older than Jeremy and has health issues that could affect her future earning capacity.

When the parties separated the marital home was in Jeremy's name, but Laura was living there and sought to have it transferred into her name. The home needed significant repairs and was worth about as much as the mortgage. Laura requested "that she be granted two years to relieve [Jeremy] of the current mortgage encumbering the home." Alternatively she requested that Jeremy continue to pay the mortgage and all other expenses on the home until it could be sold, and that he take any loss on the sale. Jeremy requested that each party pay their own costs and attorney's fees. He proposed a roughly equal property division and requested that Laura refinance the home in her name within 120 days. He did not respond to Laura's request for spousal support.

Trial began in September 2013. Laura testified that she was employed by the U.S. Postal Service and that her take-home pay was about $3,500 monthly with variations due to overtime. Jeremy testified that he was employed by Alaska Power and

Communications on the North Slope and had a gross income of about $10,000 per month.

Laura testified that she has a work-related hip injury and had a hip reconstruction in 2011. She expects to need a full hip replacement at some point. She stated that her hip injury sometimes causes her to miss work and work slower in the winter because she has difficulty walking on ice. She also testified that she was involved in a car accident in 2012 which resulted in back and neck injuries and that she has a history of malignant melanoma.

The parties also testified about their retirement accounts. The only issue relevant to this appeal pertains to Laura's Thrift Savings Plan (TSP). Laura testified that there was one loan on the TSP with a balance of $3,892 from 2010 that was used to pay off credit cards and buy "some things for the house."

Jeremy testified that he was willing to complete up to $10,000 worth of repairs so Laura could refinance the marital home in her name. The court continued the property trial so the parties could investigate how much it would cost to repair the home and whether Laura could get a loan. Less than a month later, Jeremy had completed most of the repairs and Laura had been pre-approved for a mortgage. Jeremy ultimately spent $11,087 on repairs. At a status hearing in November, it was discussed that Laura would take out a second loan from her TSP account in order to make the down payment on the home. She eventually took out an $18,800 loan.

Later that month the parties stipulated that Laura would receive the marital home at a value of $196,963. The stipulation specified that the values in the stipulation "shall be deemed final" and "[t]he value of the home will not be hereinafter adjusted should the home fall in value or increase in value prior to the court entering a final property division order in this case."

The superior court held a hearing in February 2014 to discuss the parties' agreements concerning the property division. There was some discussion about the valuation of the home; it appears the parties were still using a spreadsheet listing the mortgage balance as $204,454. Jeremy testified on direct examination by his attorney:

> Q: Do you have any idea why [the revised property list is] reusing a mortgage of 204 and a — about how you have 204 . . .
>
> A: No.
>
> . . . .
>
> Q: So we had entered into an agreement as to the debt and the value, right?
>
> A: Right.
>
> Q: And you do know that she's getting a significant amount of equity now?
>
> A: I do know.
>
> Q: And is it your understanding that you're just asking the court to consider that as the relative economic circumstances of the party?
>
> A: I am.

Additionally Laura testified that she had recently been diagnosed with two work-related tears in her shoulder. She was scheduled to have surgery requiring three months of leave from work followed by six months of light duty. Laura reiterated her request for $2,000 monthly in spousal support for two years. Jeremy testified that he did not want to pay spousal support or attorney's fees, because he "fe[lt] [he'd] supported her long enough" during the separation.

Child care costs were addressed at trial and Jeremy testified that:

A: It was my understanding that I was responsible for the child care . . . as the agreement we had between us. So it was one I was going to assume.

. . . .

Q: Forever or for two years? I mean, what — what's your deal here?

A: It's my child and I should be — I mean, I was willing to be responsible for that. So as long as he's going to an after school program, I would take care of it.

Q: So you'd be committed to doing that in lieu of paying direct spousal support?

A: Yes.

. . . .

Q: . . . [T]hat's an additional $5,400 a year and you're shaking your head. You want to do that?

A: Yes.

Q: In addition to child support?

. . . .

A: I will be responsible for my son, yes.

The superior court made oral findings later in February and entered the divorce decree, written findings of fact and conclusion of law, and a child support order in March. Laura received primary physical custody of their son. Laura was awarded the home. After refinancing, the mortgage was $187,115. And after the repairs, the assessed value of the home at the time of trial was $255,000. In its written findings, the superior court awarded the home to Laura at the stipulated value of $196,963, but noted that "on paper the home's value does assist [Laura's] overall financial position." On the attached property division spreadsheet, however, the superior court listed the value of the home as $195,210 with a mortgage balance of $204,494.

Laura was awarded an Edward Jones Investment account worth $4,435, her Roth IRA worth $1,434, and her TSP account valued at $49,178.[1] Laura received 100% of her Federal Employee Retirement System Defined Benefit, which was worth $2,800 at the time of trial. Laura received 60% and Jeremy received 40% of Jeremy's Alaska Electric Worker's Money Pension Plan and Defined Benefit Pension Plan. The value of these pension accounts is not listed in the property division spreadsheet attached to the findings of fact and conclusions of law. Laura testified that the Worker's Money Pension Plan was worth $103,000 at the time of trial, and she submitted an exhibit showing a previous value of $82,245, but neither party submitted any evidence of the value of the Defined Benefit Pension Plan. The distribution spreadsheet attached to the court's findings showed that Jeremy received a total distribution of negative $5,174 and Laura received a total distribution of $24,227.

The superior court found that Jeremy's gross income in 2013 was $137,775 and Laura's was $54,628. The superior court stated:

> Both parties have reasonably secure employment with benefits and were married less than five years or at least together less than five years before separation. The obvious, most significant factor that needs to be considered by the court is, in fact, the disparity in earnings between the parties together with factoring in a difference in eight productive earning years which [Jeremy] will have because of his age. The court finds that the above-described unequal property division is most equitable under these circumstances.

The superior court ordered Jeremy to pay child support pursuant to Alaska Civil Rule 90.3 beginning in March 2014. He was not assessed retroactive child support because he "paid a substantial portion" of the post-separation expenses, "including the

---

[1] Due to the two loans taken out of this account it was actually worth less, which the superior court noted.

mortgage payments, various utilities, cell phone bills, and all of the daycare for the child and similar expenses." Jeremy was also ordered to pay child care expenses in addition to child support payments.

The superior court found that "[Laura] will have some temporary decrease in her earning[s] as a result of [her] upcoming surgery and subsequent rehabilitative period," and "[spousal] support is necessary to assist [Laura] in an anticipated reduction for a temporary period of time." The superior court identified "allowing [Laura] to re-budget family expenses without [Jeremy's] assistance in the future" as another reason for the spousal support award. Laura was to receive $2,000 monthly from March-May 2014, $1,000 monthly from June-August 2014, and $500 monthly from September-December 2014. Support would terminate at the end of December 2014. The superior court added: "[T]he court is presuming that [Laura] will be receiving Worker's Compensation during the time that she is off of work. If this is not correct . . . , then [Laura] may ask the court to reconsider a temporary award of spousal support." The superior court's findings did not mention any of Laura's other health problems. And the superior court specifically found that "rehabilitative support is [not] necessary in that [Laura] is currently employed at a long term job with benefits."

Laura incurred an estimated $11,730 in attorney's fees. Until November 2013 Jeremy's union paid 75% of his attorney's fees. He estimated the union paid approximately $4,000 and he personally paid $4,000. The superior court ordered Jeremy to pay $10,000 of Laura's attorney's fees. The court stated it "believes that [Jeremy] does not have that amount[,] which is understandable. However, after a short period of catching up, [Jeremy] will have a greater ability to make the attorney['s] fees payment." Jeremy was to pay $5,000 by August 2014 and $5,000 by December 2014.

Jeremy asked the court to reconsider the property division, spousal support, and attorney's fees awards in April 2014. His motion was denied.

Jeremy appeals.

## III.   STANDARD OF REVIEW

"The equitable division of marital assets involves three steps: (1) determining what property is available for distribution, (2) finding the value of the property, and (3) dividing the property equitably."[2]  Under step one, underlying factual findings are reviewed for clear error.[3]  "Whether 'the trial court applied the correct legal rule' " is reviewed de novo.[4]  Step two, the valuation of property "is a factual determination . . . review[ed] for clear error."[5]  Step three, the equitable allocation of property, is reviewed for abuse of discretion.[6]

"[A]wards of spousal support are reviewed for abuse of discretion," and we will reverse "only if they are clearly unjust."[7]  Child support awards are also reviewed for abuse of discretion.[8]  However, "[w]hether a trial court applied the correct method of calculating child support is a matter of law" that is reviewed de novo.[9]

---

[2]    *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014) (citing *Beals v. Beals*, 303 P.3d 453, 458 (Alaska 2013)).

[3]    *Id.*

[4]    *Id.* (quoting *Beals*, 303 P.3d at 458).

[5]    *Id.*

[6]    *Id.*

[7]    *Urban v. Urban*, 314 P.3d 513, 515 (Alaska 2013) (quoting *Barnett v. Barnett*, 238 P.3d 594, 597 (Alaska 2010)) (internal quotation marks omitted).

[8]    *Tillmon v. Tillmon*, 189 P.3d 1022, 1026 (Alaska 2008) (citing *State, Dep't of Revenue, Child Support Enforcement Div. ex rel. Hawthorne v. Rios*, 938 P.2d 1013, 1015 (Alaska 1997)).

[9]    *Id.* (citing *Turinsky v. Long*, 910 P.2d 590, 594 n.10 (Alaska 1996)).

"The trial court has broad discretion in awarding attorney's fees in divorce actions."[10]  An award of attorney's fees will not be reversed "unless it is arbitrary, capricious, or manifestly unreasonable."[11]

## IV.  DISCUSSION

### A.  The Property Division

Jeremy challenges all three steps of the property division.  First he argues that the superior court inaccurately classified marital debts.  Second he contests the valuation of the home.  Third he asserts that the overall division of property was unfair.

#### 1.  The classification of Jeremy's home repair expenditures as a marital debt was not clearly erroneous.

Jeremy argues that the superior court improperly characterized his home repair expenditures as a marital debt, a factual finding reviewed for clear error.[12]  In the property division the superior court counted Jeremy's expenditures for home repairs as a marital debt assigned to Jeremy.  Jeremy argues this "was incorrect because that was an amount paid by Jeremy so Laura could refinance the home."  He does not elaborate on this point, leaving his exact argument unclear.  But we see no error in the superior court's treatment of the home repair expenditures.  Jeremy clearly agreed to pay for the repairs, and treating these expenditures as a debt incurred for purposes of improving the marital asset was not clearly erroneous.

---

[10]  *Schmitz v. Schmitz*, 88 P.3d 1116, 1122 (Alaska 2004) (citing *Sloane v. Sloane*, 18 P.3d 60, 64 (Alaska 2001)).

[11]  *Hooper v. Hooper*, 188 P.3d 681, 691 (Alaska 2008) (quoting *Schmitz*, 88 P.3d at 1122).

[12]  *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014) (citing *Beals v. Beals*, 303 P.3d 453, 459 (Alaska 2013)).

**2. The classification of Laura's second TSP loan as marital debt was clearly erroneous.**

The superior court classified Laura's two TSP loans as marital debts and assigned them to her. Jeremy argues these loans were post-separation and should not have been included in the property division. The first loan's balance was $3,892; the uncontradicted testimony at trial was that this loan was taken out in 2010 to buy household items and pay off credit card debt. Because Jeremy points to no evidence in the record suggesting this loan was post-separation, we conclude the superior court did not clearly err in classifying this loan as a marital debt.

The second TSP loan was a post-separation $18,800 loan Laura took out for a down payment to refinance the marital home. Laura does not dispute that the debt was incurred post-separation, but she states that the superior court treated the loan properly because it was part of the agreement to refinance the home. The stipulation provides that Laura "shall secure new financing" but it does not specifically mention a TSP loan. Laura has not pointed to any evidence in the record suggesting that the parties agreed this loan was to be treated as marital debt or any other reason why it should be classified as marital. We therefore vacate the finding that this post-separation loan was a marital debt.

**3. The superior court did not clearly err in valuing the marital home at the stipulated value of $196,963. But because the court did not specify a mortgage value, we remand for the court to assign a value.**

Jeremy challenges the valuation of the home and the mortgage debt, which are factual determinations reviewed for clear error.[13] We first consider the valuation of the home. In November the parties stipulated to a home valuation of $196,963. By the

---

[13] Id. (citing *Beals*, 303 P.3d at 459).

conclusion of the trial in February, Jeremy had completed the repairs, and the home's appraised value was $255,000. The superior court acknowledged this newly appraised value in its findings of fact, but stated that it would "follow the previously signed stipulation regarding the agreed upon value of the residence." Confusingly the accompanying property division spreadsheet listed the home's value as $195,210. However the superior court explicitly stated that "[Laura] is awarded the parties' marital home at an agreed value of $196,963." Even though it specified that "*personal property* will be divided as set forth on the property and debt distribution [spreadsheet]," it appears the court did not rely on the real property values listed on the spreadsheet. (Emphasis added.)

Jeremy asserts that the superior court erred by not considering the newly appraised $255,000 value of the home. But Jeremy advances no argument for valuing the home at an amount different than the stipulated value, and we see no justification for disregarding the stipulation.[14] The stipulation specifies that the valuation agreed upon was to be incorporated into the property division, and it was certainly foreseeable that

---

[14] "Stipulations and settlements are favored . . . because they simplify, shorten[,] and settle litigation without taking up valuable court resources, . . . and this principle applies in the context of divorce property settlements." *Notkin v. Notkin*, 921 P.2d 1109, 1111 (Alaska 1996) (alteration omitted) (quoting *Murphy v. Murphy*, 812 P.2d 960, 965 (Alaska 1991)) (internal quotation marks omitted). "When a stipulation is admitted by both parties . . . and there is no dispute as to the material terms of the settlement, the stipulation is enforceable between the parties absent fraud, duress, or concealment of other facts showing the agreement was not made voluntarily and with full understanding." *Crane v. Crane*, 986 P.2d 881, 885 (Alaska 1999). Although in a dissolution agreement the superior court must find that the parties' property division agreement is fair and just, in a divorce case there is "no affirmative duty on a trial court to examine every property settlement reached by the parties to determine if it is just." *Notkin*, 921 P.2d at 1111 n.1 (quoting *Kerslake v. Kerslake*, 609 P.2d 559, 560 n.1 (Alaska 1980)) (internal quotation marks omitted).

repairs were likely to increase the value of the property. Furthermore Jeremy testified that because he wanted to "expedite [the refinancing]" he was "okay with" paying for "code upgrades" "on his own dime" even if it meant that he would "just pay for it all and [Laura] keeps the house and any increase in equity." Finally the agreement benefitted Jeremy to some extent because it hedged against the possibility that the value of the home could decline. Accordingly the superior court did not clearly err in valuing the home at the stipulated value of $196,963 rather than the post-repair value of $255,000.

We next consider the mortgage valuation. At the first stage of the trial in September, Jeremy submitted evidence that the mortgage balance was $195,211. Laura's trial brief, submitted that same month, stated the mortgage balance was $204,454. In November the parties stipulated the mortgage balance was $196,963. When the trial continued in February, the parties agreed that the post-refinancing mortgage balance was $187,115, and the court referred to this balance in its findings of fact. But the court's findings do not specify the balance of the marital obligation at the time Laura refinanced. And the accompanying property division spreadsheet lists a mortgage balance of $204,454. As mentioned above, the superior court did not state it was relying on the spreadsheet's real property values, but we note this additional discrepancy. Because we cannot ascertain with certainty the superior court's valuation of the marital mortgage debt, we remand this question so the court may specify the correct amount.

### 4. The superior court did not abuse its discretion in equitably dividing the marital property.

Equitable distribution of assets is reviewed for abuse of discretion and is overturned only if clearly unjust.[15] "In determining an equitable division of property, a

---

[15] *Sandberg v. Sandberg*, 322 P.3d 879, 886 (Alaska 2014) ("We review a trial court's equitable division of marital property under the abuse of discretion standard; (continued...)

court's starting point is the presumption that an equal division is the most just."[16]  The court then applies the *Merrill* factors to determine whether a different allocation is called for.[17]

---

[15]    (...continued)
we will not disturb it unless the result is clearly unjust." (alteration omitted) (quoting *Williams v. Williams*, 252 P.3d 998, 1004 (Alaska 2011))).

[16]    *Burcell v. Burcell*, 713 P.2d 802, 805 (Alaska 1986) (citing *Jones v. Jones*, 666 P.2d 1031, 1034 (Alaska 1983)); *see also, e.g.*, *Berry v. Berry*, 978 P.2d 93, 96 (Alaska 1999); *Miles v. Miles*, 816 P.2d 129, 131 (Alaska 1991).

[17]    *See Burcell*, 713 P.2d at 805. The *Merrill* factors, now codified in statute, require that property division fairly allocate the economic effect of divorce based upon a consideration of the following factors:

>        (A)    the length of the marriage and station in life of the parties during the marriage;
>
>        (B)    the age and health of the parties;
>
>        (C)    the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;
>
>        (D)    the financial condition of the parties, including the availability and cost of health insurance;
>
>        (E)    the conduct of the parties, including whether there has been unreasonable depletion of marital assets;
>
>        (F)    the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;
>
>        (G)    the circumstances and necessities of each party;
>
>        (H)    the time and manner of acquisition of the property in question; and

(continued...)

The *Merrill* factors are not exclusive, and the trial court may consider other relevant factors.[18] Although "the trial court need not make findings as to every factor, nor do these findings need to be exhaustive, . . . where the parties raise significant issues regarding particular factors, the trial court must address these issues in its findings."[19] Consideration of the *Merrill* factors does not always need to be explicit or particularly formal; the trial court need only "articulate sufficiently specific factual findings to indicate the basis for the division."[20]

Jeremy appears to argue that the superior court should have applied the *Rose v. Rose* rescission approach to the property division because he and Laura separated after less than five years of marriage.[21] But in *Rose* the parties separated after 18 months

---

[17] (...continued)
> (I)    the income-producing capacity of the property
> and the value of the property at the time of division.

AS 25.24.160(a)(4); *Merrill v. Merrill*, 368 P.2d 546, 547 n.4 (Alaska 1962).

[18]    *Laing v. Laing*, 741 P.2d 649, 652 (Alaska 1987).

[19]    *Davila v. Davila*, 908 P.2d 1027, 1032 (Alaska 1995) (citing *Brooks v. Brooks*, 677 P.2d 1230, 1233 (Alaska 1984)).

[20]    *Id.* (quoting *Lang v. Lang*, 741 P.2d 1193, 1195 (Alaska 1987)); *see also Lundquist v. Lundquist*, 923 P.2d 42, 53-54 (Alaska 1996) (holding there was no error where trial court divided property 50-50 but did not make explicit findings on *Merrill* factors because "the court's findings, when read in their entirety, demonstrate that the court considered many factors," including specifics about the couple's real property). These findings permit meaningful review. *Davila*, 908 P.2d at 1032; *see also Oberhansly v. Oberhansly*, 798 P.2d 883, 885 (Alaska 1990) ("Given adequate factual findings, and a demonstration that the trial court weighed those facts in reaching its conclusion, we will not overturn a property division unless it is clearly unjust." (quoting *Lang*, 741 P.2d at 1196)).

[21]    755 P.2d 1121, 1124-25 (Alaska 1988).

of marriage, maintained separate checking and savings accounts during the marriage, and each owned their own home.[22] The rescission approach is not appropriate here where Laura and Jeremy owned a home together and maintained joint bank accounts and credit cards.[23]

Jeremy also argues that when evaluating the relative economic strength of the parties, the superior court failed to adequately consider the increase in home equity Laura received. But Jeremy and Laura had already stipulated to the value of the home and agreed that the stipulated value would be used in the property division; the court was not required to consider the higher value suggested by the appraisal that was completed pursuant to Laura's refinancing of the home. And there is insufficient evidence to suggest that the overall property division was unfair, particularly given the lack of evidence concerning Jeremy's pension plans. Although the superior court may need to adjust the property division in light of the classification and valuation errors discussed above, we see no other error regarding the equitable property division.

## B.    The Spousal Support Award Was Not An Abuse Of Discretion.

Alaska's divorce statute provides for spousal support "as may be just and necessary . . . [to] fairly allocate the economic effect of divorce."[24] It is preferable to allocate the economic effect of divorce through property division rather than spousal support.[25] "[A]wards of spousal support are 'only appropriate when the marital estate

---

[22]    *Id.* at 1122-23.

[23]    *See Bell v. Bell*, 794 P.2d 97, 102 (Alaska 1990) (concluding that *Rose* did not apply because the parties commingled assets).

[24]    AS 25.24.160(a)(2).

[25]    *Urban v. Urban*, 314 P.3d 513, 516 (Alaska 2013).

is insufficient to meet the needs of a disadvantaged party.' "[26] The determination of spousal support is based on factors similar to those controlling the division of property.[27]

Jeremy argues that the superior court abused its discretion by awarding Laura spousal support because spousal support was not necessary to "fairly allocate the economic effect of divorce."[28] He alleges that the superior court "failed to consider any of the factors listed in AS 25.24.160(a)(2) and failed to make any findings with regard to any of those factors that might have been relevant. . . . The only factor[s] considered by the trial court were improper ones." (Emphasis omitted.) Jeremy contends the

---

[26] *Id.* (quoting *Barnett v. Barnett*, 238 P.3d 594, 599 (Alaska 2010)).

[27] *Compare* AS 25.24.160(a)(2)(A)-(E), *with* AS 25.24.160(a)(4)(A)-(E). The superior court should consider:

> (A)    the length of the marriage and station in life of the parties during the marriage;
>
> (B)    the age and health of the parties;
>
> (C)    the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;
>
> (D)    the financial condition of the parties, including the availability and cost of health insurance;
>
> (E)    the conduct of the parties, including whether there has been unreasonable depletion of marital assets;
>
> (F)    the division of property . . . ; and
>
> (G)    other factors the court determines to be relevant in each individual case.

AS 25.24.160(a)(2).

[28] *See* AS 25.24.160(a)(2).

superior court awarded spousal support "to provide relief from the economic effect of an on-the-job injury and the economic effect of being the victim in a tort action[,] i.e., being rear-ended by a negligent driver." He asserts that spousal support "should be barred by the exclusivity provision of the Federal Employees Compensation Act" (FECA).[29] And he argues that Laura's job-related injury and vehicle accident occurred post-separation. He adds that "spousal support is not intended as a means to equalize income" and "Laura did not produce any specific information regarding [her] inability to meet her financial needs."

Laura replies that she did not actually receive worker's compensation for her shoulder injury and that, even if she had, the compensation would have been only "75% of her gross pay, with no Cost of Living Adjustment or health benefits." Jeremy points out that this compensation is non-taxable, so her take-home pay would not be reduced by the full 25%. Laura also argues that her shoulder injury was not post-separation but "had occurred 'over time' due to repetitive use, but had only recently been diagnosed." And she contends that the superior court did consider the appropriate statutory factors and did not consider the improper factor of her car accident injury.

Jeremy's arguments are unpersuasive. First there is no indication the superior court considered Laura's injuries from the car accident in determining the spousal support award. Although Laura testified to these injuries at trial, they are not mentioned in the superior court's oral or written findings. Thus Jeremy's arguments about why it is an error of law to require a "former, innocent spouse to compensate the other spouse for an injury" caused by a third-party in a car accident are irrelevant. FECA's exclusivity provision is also irrelevant because it relates only to claims against

---

[29]    *See* 5 U.S.C. § 8116(c) (2012) ("The liability of the United States or an instrumentality thereof under this subchapter . . . with respect to the injury or death of an employee is exclusive and instead of all other liability of the United States . . . .").

the federal government;[30] moreover, the superior court in no way held Jeremy *liable* for Laura's work-related injuries. Laura is correct that the superior court considered a number of the statutory factors, such as Jeremy's and Laura's respective annual gross incomes of $137,775 and $54,628, and the fact that Laura was anticipating a temporary reduction in her earning capacity due to her upcoming shoulder surgery. Under these circumstances, the superior court did not abuse its discretion by awarding Laura spousal support.

C.     **Requiring Jeremy To Pay Child Care Expenses In Addition To Child Support Was An Abuse Of Discretion.**

Jeremy appeals the order that he pay child care expenses on the grounds that he "only agreed to pay child care expenses if the payment was in lieu of paying spousal support." Jeremy's position is that this agreement was nullified by the superior court's decision to award spousal support. Consequently he argues that the superior court's factual finding "that Jeremy agreed to pay child care expenses over and above his child support" was clearly erroneous. He also argues that the superior court failed to consider that he may have a right under Rule 90.3(a)(1)(E) to deduct child care expenses "to the extent they were paid to allow him to work and would have the right to a credit on his child support to the extent the expenses were paid on Laura's behalf."[31]

The finding that Jeremy agreed to pay child care expenses in addition to child support was clearly erroneous because Jeremy offered to pay child care expenses only if he was not assessed spousal support. The superior court did not address this

---

[30]     *See id.*

[31]     *See* Alaska R. Civ. P. 90.3(a)(1)(E) ("Adjusted annual income as used in this rule means the parent's total income from all sources minus . . . work-related child care expenses for the children who are the subject of the child support order."); Alaska R. Civ. P. 90.3 cmt. III(D)(4) (explaining that it is permissible to deduct "reasonable child care expenses that are necessary to enable a parent to work").

qualification on Jeremy's offer. Because Jeremy did not agree to pay child care expenses if he was assessed spousal support, requiring him to pay child care expenses in addition to child support was an abuse of discretion. We need not address Jeremy's arguments pertaining to credits or deductions because, although a custodial parent is entitled to a deduction for child care expenses that are necessary to allow the parent to work,[32] Jeremy is a noncustodial parent, and he is not entitled to deduct child care expenses when their son is in Laura's care.

**D.    The Attorney's Fees Award Was Not An Abuse Of Discretion.**

"[C]ost and fee awards in a divorce action are not to be based on the prevailing party concept, but primarily on the relative economic situations and earning powers of the parties."[33] "In divorce actions, the purpose of awarding attorney's fees is to assure that both spouses have the proper means to litigate the divorce action on a fairly equal plane."[34] "When the parties' economic situations and earning capacities are comparable, each party should bear his or her own costs. Otherwise, awards of attorney's fees are committed to the trial court's discretion."[35] "[T]he disparity in income between the parties" is "an adequate explanation" for an attorney's fees award.[36]

---

[32]    *See* Alaska R. Civ. P. 90.3(a)(1)(E); Alaska R. Civ. P. 90.3 cmt. III(D)(4).

[33]    *Hooper v. Hooper*, 188 P.3d 681, 691-92 (Alaska 2008) (quoting *Rodvik v. Rodvik*, 151 P.3d 338, 351 (Alaska 2006)) (internal quotation marks omitted).

[34]    *Schmitz v. Schmitz*, 88 P.3d 1116, 1130 (Alaska 2004) (quoting *Lone Wolf v. Lone Wolf*, 741 P.2d 1187, 1192 (Alaska 1987)) (internal quotation marks omitted).

[35]    *Id.* (footnote omitted) (citing *Dodson v. Dodson*, 955 P.2d 902, 914 (Alaska 1998)).

[36]    *Hooper*, 188 P.3d at 692.

Jeremy asserts that the superior court abused its discretion by awarding Laura attorney's fees because it "failed to consider the fact that [the] property award and Jeremy's willingness to come forward and pay expenses while the parties litigated . . . placed Laura in a much better economic position th[a]n that of Jeremy." Jeremy argues that the superior court should have considered that he continued to pay post-separation expenses while Laura was living in the home. Laura responds that Jeremy should not be excused from paying attorney's fees because he paid household expenses post-separation; he did this instead of paying child or spousal support, not gratuitously. And the superior court gave him credit for these contributions when it decided not to award retroactive child or spousal support.

Jeremy's assertion that Laura is "in a superior economic position" is unpersuasive. Jeremy's income is substantially higher than Laura's, and Laura is anticipating a temporary income shortfall due to her surgery. Laura did not receive liquid assets she could readily use to pay her attorney's fees. And the superior court took Jeremy's economic situation into account when it gave him additional time to pay the attorney's fees in two installments. The superior court did not abuse its discretion by awarding Laura attorney's fees.

## V.    CONCLUSION

We REVERSE the superior court's order concerning payment of child care expenses. We VACATE the superior court's finding that the post-separation TSP loan was a marital debt as well as its valuation of the mortgage debt associated with the marital home. We REMAND with instructions to clearly indicate the balance of the mortgage assigned to Laura. We AFFIRM in all other respects. The superior court may adjust the property division in light of the foregoing mandates.